Next case on today's docket is the case of the state-applied Webster Jr. Vice-Executor Joseph D. Webster v. Larry Thomas, Jane Tice, and T.T. & W. Agra Partners, a.k.a. T.T. Agra Partners Company, defendant's appellants. We have Mr. Thomas Immel for the appellant and Mr. Stephen Kaufman for the appellate. So you may proceed, Mr. Immel, when you're prepared to. Thank you. Good afternoon. Good afternoon. Mr. Kaufman, and please, the court. I do a lot of this work. Sometimes I have found that due to the crush, the courts have not always been able to read briefs prior to hearings, at least fully. This court does. And that's – thank you. Then I'm not going to belabor the history of the T.T. & W. formation, et cetera, because it would consume my entire 20 minutes. The fact is that this matter arose between people who had a longstanding relationship, Mr. Tice and Mr. Webster, the deceased that went back many years and was formed for the purpose of avoiding a tax liability to the extent of $35,000 that Mr. Webster was going to incur if he did not have a place to park the proceeds of a prior sale. I'd like to go directly to what I perceive to be the problems with what happened at the end of this case and then backtrack into the occurrences at trial that give rise to my argument. As to the order on appeal itself, as modified by the trial court when we entered the 504 letter, that order that we're appealing from was written, in fact, by Mr. Kaufman, not the court. It was prepared just prior to the end of the case and tendered to the trial court during closing arguments. I don't think there's any debate about that, but it occurs at page 556 of the transfer. The court only filled in six blanks, four of which were Mr. Tice's name, one of which was a subparagraph of the partnership act, and one of which was filled in 20 days to file a plan with the court. The test, the order, interestingly enough, and it's in the appendix to my brief as most handily available to you, and I think appears as page one of my appendix to the opening brief. The order makes no reference of any kind to any testimony or exhibits, which is, of course, readily explained by the fact that it was prepared during the course of the trial or immediately prior to. I'm not sure when. I've never asked, but I don't really think it matters. The order makes findings regarding Mr. Tice having committed a breach of fiduciary duty under section 4042C. That C is what appears on the blank line toward the end of the order. I think on page seven. And by the way, the court makes no reference to any research or his opinion about witnesses. There's nothing in there. There's no finding about credibility. Interestingly enough, there's not even a notation from the court that he took copious notes, although I noticed in Mr. Kaufman's brief that he said the court had. But then in looking back, I see where he said that to the court in his closing argument at page 536. But in fact, the judge never said he'd taken copious notes. Only Mr. Kaufman said that. I don't know what the judge did or didn't do with respect to that. He didn't make any findings on credibility. He didn't comment whatsoever. In other words, generate his own work product on the issue of apparently important issue. As far as Mr. Kaufman is concerned, credibility witnesses. He didn't make any comment on evidence in any independent document that he used to amplify upon this form order that was given to him. As a result, he makes the finding that there's a breach of fiduciary duty, but makes no finding of any evidence or concerning any evidence that would make a showing of the gross negligence, reckless conduct or intentional misconduct that that section would have required to be shown to say that Mr. Tice had breached his fiduciary duty. And also that leaves unspoken the question of whether or not that section even applies in this case, because the estate was not a partner in the partnership. And that section of the Partnership Act seems to apply to relationships between partners. I would argue that it does. I leave it to yourselves as readers to see if you agree with me. But the estate's never been a partner. And there's certainly no basis for a companion imposition of attorney's fees under paragraph 24 of the partnership agreement, which is Defendant's Exhibit number four. I'm calling particular attention to page nine. The partnership agreement only applies as between partners. And the estate was not there. Now, I'll get to the question of the estate's status in a moment, because there is some confusion I've had throughout this matter and in reading their brief as to whether they think they were partners or not. In one moment, and I mentioned this in my reply brief, they seem to have a split personality on this. In one moment, they seem to want to argue that they have the rights of a partner, even though Clark Fisher had died and even though per Section 10 of the partnership agreement, there had been no vote to extend this partnership. And it was not the intention of Mr. Tice and Mr. Thomas to extend the partnership. And everybody knew that. The message was sent to the executor of the need to wrap up and conclude the partnership. Yes. Which you say was ignored. What did the partnership do? They didn't need his permission. No. But they did nothing for five years. Well, see, here's the point. Under Section 11 of the agreement, the partnership ended upon dissolution. Not upon death. Upon dissolution. Well, dissolution is death under the. Where it says death. Anywhere in any other partnership agreement. Upon death, then the partnership shall be dissolved. Is that language there? Yeah. It is? I think it is. I'm thinking back to Section 10. The partnership ends upon the death of a partner. And it does not then continue Section 10 toward the top of that page. I think it's got a separate note. But the trial court relied upon Paragraph 11. Well, but there's definitional parts in Section 10 that apply regardless. And let me get it out here and call your specific attention to this because I have it in front of me. Section. Let me. Let's see. Like that. I'm sorry. Your Honor. I'm looking at 801-2-9-2-5. Are you looking at the statute or the partnership agreement? Oh, I'm looking at the statute. The question I was seeking to address had to do with the agreement itself. Okay. The trial court below found that the partnership dissolved, and the other side has argued that the partnership dissolved with the death of Clyde Webster. I don't think there's a disagreement about that. The question is, was it properly wrapped up and terminated? And that has to do with the wrap. Well, the only person that could wrap it up and terminate it would be your clients. Well, there's two ways to do this. One is to do as my people wish to do, which was to say, okay, let's peg the value at the date of Clyde's death, determine the value up or down from where we stood at the beginning, pay him the fair market value of the property minus his mortgage, his deadness, anything he owed to the partnership by way of past interest that he had on rebate or something, and the 10% discount, which, according to their own accountant, was the pass-through because of the safety net that had been created by depressing the value of the property when they first started. So that would pass through. Had that happened, had Mr. Webster agreed to that because they were chasing him all the time, had that happened at the outset right after Clyde died or shortly thereafter, this all would have been over then for about the same amount of money we're talking about if we did it today. There's a slight difference. Actually, they would have gotten it. I don't understand what you mean by they were chasing him. They filed tax returns for five years listing the estate as a partner. Yeah, that was Mr. Brummel, who was Mr. Webster's accountant. And they presume to know what his accountant's doing? People are presumed to know what their accountant's doing there. They don't necessarily know why. And, yes, my client's a CPA, but he hadn't prepared tax returns in years. He's a financial officer. And, in fact, we got another accountant to check it, the plaintiffs did, and they called him as a witness, Mr. Fred Markwell, and Mr. Markwell said that was wrong. And he amended the returns to effectively delete the estate from reference because they shouldn't have been. And how could they be? They weren't a partner anymore. The partnership had not been extended. And, of course, Clyde couldn't be because he was dead. That leaves two surviving partners in the TT&W partnership, which has to be resolved. And they should not appear. It was also my advice that they should amend the returns because that was my take on it. So what did the estates do to prevent the partnership from being liquidated? Wouldn't talk to them. They wouldn't agree on an amount. When we finally did just say, we give up, here's your check, they just sent it back. I sent them a letter with the check attached. It's exhibit number 10. And a photocopy of the check, cashier's check. They just sent it back. That's not right. They want current market value today. Well, farm prices started going way up. In about 2006, they really started to move. And by today, they're a lot higher. That's a given. I know that's the case. And I've always raised this hypothetical question. Supposing the price of the estate is the same or had dropped, would we believe? The answer, I think, is no. This is about the estate through its Mr. Webster. And according to his testimony, his lawyers in law, there are several lawyers looking over his shoulder. He said that in court. They want more money. They want to try to get in on the boom that occurred after Clyde died. Way after Clyde died, four years before they started to move. And that's just utterly inequitable, for one thing. And equity does apply here. That's the very first thing I've noted in Section 801. I think it is Section 1. It says the principles of equity apply. And these proceed under the Partnership Act. And I set it out in full in my brief, the statutes of the law. The fact is that upon Clyde's death, nobody voted to extend the thing because they didn't want to. And they immediately engaged in a colloquy, including Mr. Brummel, the accountant who they thought was their accountant exclusively, but then found out later, the Friday before the trial started, that Mr. Brummel had in fact been in a colloquy with Mr. Joe Webster, the executor, clear back in 2002, advising him on how he should handle himself in dealing with Mr. Tice and Mr. Thomas. And he started doing Mr. Webster's accounting work for his business. And then he prepared the estate tax returns, incorrectly listing the partnership as a taxpayer, the estate as a partner. If you look at the order that we proposed to the trial court, which had to be included by supplemental record action because the clerk had not included it down at the circuit court level, starting at page 10 and running through page 16, you'll see the order that we proposed to the trial court, which was done. I mean, I wrote it, and I did it after the case was over, although still without benefit of a transcript at that point because it didn't arrive until a couple of weeks later. Citing specific testimony and specific exhibits going through what I believe was a fair and rational characterization of the critical elements of the case, I came to a different conclusion, you could say, and that's no surprise. And I tendered that to the trial court, never heard any more about it. It was never mentioned. It didn't even make it into the record until it went to post-record action to make sure it was there. The proposed order that we assembled for the clerk directly reflects testimony that came from the mouths of live witnesses and makes specific reference to the exhibits that those witnesses were speaking about. Tellingly, two of the witnesses called by the plaintiff didn't help him at all and, in fact, hurt him. One was Mr. Brumble, his accountant, who they called. We wanted him there, too. He testified that the 10% deduction for the safety net passing through was appropriate. There's no testimony to the contrary anywhere. And Mr. Markwell, their witness who identified the tax returns, which take up a huge chunk of the defendant's exhibits, because they put all the returns in, including the amended returns. All the returns in question that had to be amended were signed by Mr. Brumble as the preparer. All of those returns were examined by Mr. Markwell, and he amended all of them. And he's a senior tax partner, according to his testimony at the McLattery firm, the same firm where Mr. Brumble used to work. And Mr. Markwell said that the preparation of the amended returns was proper. Now, there was some language in the amended returns as to the reason for filing them, and that language was off the mark. What it simply should have said was that the decedent, Mr. Webster, has an estate in probate, and neither he or the estate are partners subject per the partnership agreement. And that's all it should have said. It went on to try and rattle on that there was a buyout and said that the buyout hadn't happened. We've been trying to get Mr. Webster to talk to us, but Mr. Webster, unbeknownst to us, had conferred with his, as he called them, attorneys-in-law, and they decided just not to sell and not to respond. So he went into this turtle position and never would talk to us. Mr. Brumble even, and he testified, he was asked by Mr. Tice, would you please get Joe to call us or something? And Mr. Brumble said he faithfully communicated that request to Mr. Webster down in his office in the St. Louis area, and still no response. Couldn't get him to talk to us. And that was the only other way to effectuate what we were hoping was to get him to have a dialogue with us, because the very first proposal that had been made prior to Clyde's passing away was a time payment proposal as dictated by Section 10. And they said, look, we don't have to do that. We can do a cash, no problem. But they couldn't talk to him. He wouldn't communicate with them. So they didn't do anything, and they should have probably filed suit. But this is Jim Webster's friend of 30 years. Jim Tice's friend of 30 years dies, and we're going to go sue as a state? Great. And besides that, who wants to do that and get into a lawsuit where this is so simple? Let's just talk and work it out and get it done. Well, that couldn't happen. And the other option, then, Your Honor, going back to what you were talking about, was to sell the property at a public sale, the property that had been Tice and Thomas's from the beginning and that they had carved to get Clyde in so he could meet the requirements of this 1031 exchange. The testimony reveals that. They designed that in such a way that those who owned at least 120 units can dissolve at any time. Yes. Because they didn't give him the right to reject it or oppose it. And I just can't figure out what prevented your clients from just liquidating it and saying, here's your money. Well, that would involve selling the property to a third party. And Larry Thomas, who was the farmer on the property, surrounds his house. He sits on three acres surrounded 360 degrees by the farm. And he wants to continue, always wanted to continue farming. And his son is now helping him farm. Larry's in his 70s. That's all I can think of. And time has expired. Yes, it has. Again, I'm encouraging the court to reverse remand. Using the order I have prepared as an outline, use it as a means to get to the right conclusion here. And I thank you for your time. Thank you. Mr. Kaufman. Thank you. May it please the court, counsel. My name is Steve Kaufman. I'm with the Hipper Broom Law Firm. And I represent the plaintiff, the estate of Clyde Webster, in this case. Our bottom line argument, as no doubt you expect, is that Judge Roberts got it exactly right. After a two-and-a-half-day bench trial in which seven witnesses were called, over 60 exhibits were admitted into evidence, everyone got a fair trial. Everyone got in the evidence that they wanted to get in. We had extended closing arguments in the case. Judge Roberts got it right. There's no reason that this case would ever be retried or remanded to change his opinions in this case. Now, at the conclusion of argument, I submitted to the court proposed findings of fact and conclusions of law. Counsel did not have his prepared at that time and asked for some seven or ten days to submit his, which he did. Judge Roberts then took the matter under advisement for some four or five weeks before ruling and signed the order which I submitted, which is sufficient and which very clearly and properly rules in our favor on all issues. Now, issue number one, as defined by the appellant, the court correctly ruled that the defendants failed and refused to liquidate the partnership. It has been stated in this courtroom, and I will submit to you and I don't say this lightly, that it is a complete misrepresentation of the exhibit, the partnership agreement, to contend that it contained a buyout clause upon the death of a partner. It most certainly did not. There were only two choices submitted to the surviving partners upon the death of Mr. Webster in September of 2002. Option one was to continue the partnership. Option two, per paragraph 11, was to liquidate and distribute the proceeds of the partnership. You don't dispute that the defendants reached out to the state to say we want to liquidate or close out the assets and dissolve the partnership? Here's the way the record played out, Your Honor, and I'm going to answer that directly. Mr. Webster died in September of 2002. In the spring of 2002, prior to his death, there was some discussion between Mr. Webster and the other partners about buying his portion of the estate. The record is also clear that they could not arrive at an agreement. But didn't he just ignore them? Didn't the estate just ignore their requests? Well, this is before that, Your Honor. Okay. Mr. Webster turned down the offer. He then dies in 2002. Okay. In the spring of 2003 and 2004, about tax time, Mr. Tice communicated in some fashion to Mr. Webster, who was the executor, to see if they wanted to go back to and accept that deal that was proffered to his father before he died, which he rejected. He decided not to. In 2005 and 2006, the record reflects that inquiry was also made, not in writing, but there was silence. Any reasonable person would assume that that meant, I'm not interested. In 2007, Mr. Webster expressed an interest in perhaps selling the interest at the current appraised value. And that's when the stuff hit the fan, if you will. And Mr. Tice began trying to basically organize a campaign to have the value at Clyde Webster's death be the defining moment. And that is not provided for in the agreement whatsoever. As the court has recognized, at any time, because Tice had 80 units, Thomas had 40, they had the ability at any time to liquidate that partnership. The day after Clyde Webster's death or at any time. Still hadn't done it. So, Judge Roberts' ruling on that score was not against the manifest way to the evidence. Issue number two, the court correctly ruled that Mr. Tice breached his fiduciary duty to the estate by not, even to this day, liquidating the partnership. Again, they had the power to do so at all times. For five years, in filing tax returns and keeping the books of the partnership, and in applying for farm subsidy payments, which are the lifeblood of Illinois farmers, they were certainly content to treat the estate as a partner. Then, an inquiry was made about selling at the current appraised value. No resolution could be reached. They contended that somehow paragraph 10 controlled. We contended that paragraph 11 controlled. No resolution could be reached. We rushed to court, asking the court to declare which one applied. We filed a very prompt summary judgment motion, fully briefed, fully argued. Judge Roberts, in December of 09, ruled in our favor. Paragraph 11 applies. You must liquidate. Still no liquidation. The partnership expired by its terms in January of 2010. Still no liquidation. Instead, we had a trial. We won. Still no liquidation. And here we are on appeal. Mr. Tice has forced the estate to incur very substantial attorney's fees due to what he should have done in the first instance. Issue number three is that Joe Webster's actions somehow prevent liquidation should he be stopped. That's an equitable offense. They have the burden of proof. The standard of review is abuse of discretion. And as the court has recognized, Joe Webster could have done nothing to stop that liquidation at the time of death or at any time thereafter. Either by Mr. Webster's statements or his silence, he was simply not interested in their buyout proposal. And he didn't have to agree to it. The court was very correct after looking at all the witnesses, judging their credibility, that he did not stop and should not be stopped from enforcing the terms of the agreement. We can't rewrite the agreement at this time to put in a buyout provision which is not there. All the parties agreed to that back in 1997. So in conclusion, we would ask you to affirm the rulings in the order of Judge Roberts. Thank you. Thank you, Mr. Kaufman. Mr. Amos, do you have a follow-up? Yes, thank you. I'd like to address a couple points that Mr. Kaufman raised. First of all, he said the bottom line was that at the trial everybody got to put in all the evidence they wanted. And I think that's true. A lot of the evidence they put in was quite helpful to our argument. The problem was that the order does not reflect what even happened at the trial, much less what we wanted. And I'm sorry, but I never said there was a buyout on death clause in the argument. In my argument, Mr. Kaufman seems to think I did. What I was saying was that by operational law, a partnership ends as to a particular partner when he dies. And his estate then moves into his position in a lot of instances in the absence of some provision to the contrary. This partnership agreement had such a provision. It said it could not be continued without the vote of the other people. And they didn't want to do that. Did Mr. Clyde Webster ever turn down an offer? Not that we know of. The first time we heard that is that Joe Webster, who's the only person who knows that because Clyde's dead, Joe Webster said he did. We don't know that. We never heard anything from Clyde prior to his death. We didn't bother him because he was deathly ill. And then he says we told him that we wanted to go back to the earlier deal. No, he never suggested that at all. We were perfectly amenable to working out anything that would have made it possible for Mr. Thomas to continue farming the land and own it. And we wanted our land back. And, no, there's no buyout clause in this contract. But Section 11, Paragraph 11, doesn't forbid a buyout, nor does it mandate a public sale. There's no case law on this, by the way, and he cited none and I couldn't find any, that says what to do about Paragraph 11. The parties can settle their differences any way they want. But they're holding our feet to the fire to use the current values, which I believe are somewhere on the order of $6,000, $7,000 an acre, just because they sat for this time and wouldn't answer us. Also, they say they want to go back to the earlier deal. No, we don't. Does Mr. Tice have a duty to the estate? Legally, no. I contend, and I think I'm right on this, that this section of the Partnership Act that he relies upon has no application whatsoever to anything but the relationship between partners. And the estate was not a partner. That's a given. It could not be a partner. It was not extended. The partnership was not extended, and they did not enjoy partnership status, and the tax returns were all screwed up in that respect and had to be fixed according to their witness. There's no testimony to the contrary. Likewise, Section 24 of the partnership agreement itself, which provides for payment of attorney's fees in the event of abuse and disgraceful behavior, only applies as between partners. And, again, they're not in that situation. But when you look at the evidence in the testimony of Mr. Tice and read it carefully, please, and then look at the testimony of Mr. Webster, who testified twice, both as my adverse witness and then as their witness, and I cross-examined him twice, he was all over the place. He was not a good witness. He contradicted himself. He stated things that were contrary to his correspondence. Even in their brief, they said he wanted to get – he was angry at Tice because he couldn't get an appraisal from him, except one that was at the date of Clyde's death. And yet, Exhibit No. 7, I think it is, is his letter asking – advising Tice that he could have paid Webster to get an appraisal. Excuse me. Go get your appraisal, as you said. No, this is 7. It's 8. Exhibit 8, February 13, 2007, advising that he's arranging for an appraisal. End of that argument. Attorney's fees incurred by the state are self-imposed hardship. They didn't have to take this action. They could have cooperated starting back in 2002 when Clyde passed away and moving forward. They could have picked up the phone. They could have engaged in a colloquy. They could have had this all wrapped up. But they said they wanted to liquidate it. They won't say what they mean by that. Liquidate in the dictionary means reduce the cash. We were ready to reduce Clyde's position to cash over and over. Thank you. Thank you, Mr. Animal. Mr. Kaufman, Louisville Tice Managers, Advisors, and Renders of Willingness, of course. Thank you. This court is adjourned in recess until 9 o'clock tomorrow morning. All rise.